CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

AUG 08 2017

JULIA C. DUDLEY, CLERK
BY: _____
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ROANOKE DIVISION

|  |  |  |
|---|---|---|
| ABDUL-HAMZA WALI MUHAMMAD, | ) | CASE NO. 7:16CV00223 |
|  | ) |  |
| Plaintiff, | ) |  |
| v. | ) | MEMORANDUM OPINION |
|  | ) |  |
| HAPPY EARL SMITH, ET AL., | ) | By: Hon. Glen E. Conrad |
|  | ) | United States District Judge |
| Defendants. | ) |  |

Abdul-Hamza Wali Muhammad, a Virginia inmate proceeding pro se, filed this civil rights action pursuant to 42 U.S.C. § 1983. Liberally construing Muhammad's complaint, he asserts four misjoined claims in his complaint, alleging that: (1) rectal examinations performed on him constituted sexual assault, (2) his placement on suicide watch was retaliatory; (3) certain classification decisions were made without due process, and (4) denial of the darkest available tint on his eye glasses was deliberate indifference, all in violation of his constitutional rights.

Muhammad is incarcerated at Red Onion State Prison ("Red Onion"), a high security facility in Pound, Virginia, operated by the Virginia Department of Corrections ("VDOC") where the alleged violations occurred. In his verified complaint, Muhammad sues the following VDOC and Red Onion officials: Fred Schillings, Marcus Elam, Earl R. Barksdale, Israel D. Hamilton, Victoria Phipps, Patti Harless, Rebellion Deel ("Deel"), Arvil J. Gallihar, Geraldine Gene Baker, Amee B. Duncan, Kelly M. Stewart, Joe Fannin, Jason Bentley, T. Huff, D. Trent, Lt. Gilbert, Sergeant Clinton Deel ("Sgt. Deel"), Officer Mullins, Officer Moore, Officer Belcher, Officer Brown, Officer Martin, Officer Freeman, K.D. Gibson, and Michael C. Younce ("the non-medical defendants"). He also sues Dr. Happy Earl Smith and Dr. Charles Owens, a physician and an optometrist, respectively, who provided him medical care at Red Onion. As

relief, Muhammad seeks monetary damages and declaratory and injunctive relief referring him to a gastroenterologist and ordering his transfer away from Red Onion and western Virginia.[1]

The defendants have filed motions to dismiss, or in the alternative, motions for summary judgment. Muhammad has responded to the motions and has also filed a motion for summary judgment. He seeks to incorporate by reference into his responses the 41 two-page affidavits and other documents that he has submitted to the court in batches since filing the complaint. When he attempted earlier to amend the complaint to add four additional, but unrelated claims and the numerous affidavits to the case, the court denied the motion. The court will, however, consider all of Muhammad's submissions as part of his response to the defendants' motions and finds all the motions to be ripe for disposition.

Because Muhammad's complaint sets out four distinct claims, the court will separately address them. Upon review of the record, the court finds that the defendants' motions must be granted as to all claims except the allegation of retaliatory suicide watch, and that Muhammad's motion for summary judgment must be denied.

## I.

### A. Standards of Review

A motion to dismiss tests the legal sufficiency of a complaint. See, e.g., Bell Atl. Corp. v. Twombly, 553 U.S. 544, 553-63 (2007). "[T]he complaint must be dismissed if it does not allege enough facts to state a claim to relief that is plausible on its face." Giarratano v. Johnson, 521 F.3d 298, 302 (4th Cir. 2008) (internal quotation marks and citation omitted). In conducting its review, a court must view the facts in the light most favorable to the plaintiff, but "need not accept as true unwarranted inferences, unreasonable conclusions, or arguments." Id. (internal quotation marks and citation omitted). "[L]egal conclusions, elements of a cause of action, and

---

[1] The court previously denied Muhammad's requests and motions for preliminary injunctive relief.

bare assertions devoid of further factual enhancement fail to constitute well-pled facts" however, and thus, need not be taken as true. <u>Nemet Chevrolet, Ltd. V. Consumeraffairs.com, Inc.</u>, 591 F.3d 250, 255 (4th Cir. 2009).

An award of summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). For a party's evidence to raise a genuine issue of material fact sufficient to avoid summary judgment, it must be "such that a reasonable jury could return a verdict for the non-moving party." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). In making this determination, "the court is required to view the facts and draw reasonable inferences in a light most favorable to the nonmoving party." <u>Shaw v. Stroud</u>, 13 F.3d 791, 798 (4th Cir. 1994).

B. Claim 1: Sexual Assaults

1. Muhammad's Allegations

On November 3, 2015, defendants Belcher and Brown escorted Muhammad to the medical unit after he complained of bloody stools. In the triage room, Muhammad saw "KY lubricant jelly" on the counter and told defendant Deel that he did not want or consent to a prostate examination. (Compl. ¶ 34, ECF No. 1.) Deel said, "I'll let Dr. Smith address that since he is the lead primary care physician." (<u>Id.</u>)

Dr. Smith told Muhammad, "I overheard your conversation[. I] must get to the root of why you['re] having bloody stools. You do want to find out what's causing your serious medical condition right. If [I] don't do anything and it get[s] wors[e], or if you don't allow this to take place today[,] there's no need in writing medical at all again whining and crying about the bloody stools." (<u>Id.</u>)

3

Muhammad said, "[Y]ou read my childhood history and you already [know] that I was sexually assaulted forcible sodomy [by relatives]. . . ." Id. "Why don't you just refer me to a gastroenterologist[?] . . . I am not, will not be a willing participant in this sexual assault. . . ." (Id.) Muhammad said that "if [the doctor] was going to sexually assault [him] by penetrating [his] anallingus with lubricated gloved finger(s) it would be done on his own accord." (Pl.'s Aff. 1, ECF No. 7-8.) He reminded the doctor that in October 2015, his "urine sample PSA level . . . [had] already proved that [he didn't] have an enlarged prostate." (Id.) Dr. Smith replied, "It was normal but that does not mean it's not swollen or enflamed." (Id.) Dr. Smith then had the officers cuff Muhammad's hands to the front, pulled down his boxers, bent Muhammad over, "massaged both buttocks, repeatedly telling [him] to loosen up [his] buttocks," and "forcibly sodomized for up to two minutes and thirty seconds." (Compl. ¶ 34, ECF No. 1.) When done, Dr. Smith said, "Well you don't have an enlarged prostate or hem[o]rrhodal flare up, nor any rectal bleeding." (Id.)

On November 19, defendants Martin and Freeman escorted Muhammad to medical for an "emergency visit" at Dr. Smith's order. (Id.) When Muhammad saw KY jelly in the triage room, he demanded to be returned to his cell and said, "I will not be subjected to sexual assault a second time." (Id.) Dr. Smith said, "Nobody sexually assaulted [you] on 11/3/15. It was a medically verbally consented procedure by you." (Id.) Muhammad retorted that he had not consented to the procedure and did not want a second rectal exam. Dr. Smith said, "If I do do it what are you going to do about it[?] [No one] will believe you. Nobody likes you. You are just a means to a paycheck." (Id.) Muhammad said that he would not "voluntarily participate in . . . being sexually assaulted." (Id.) The doctor had Muhammad cuffed to the front, "yanked" down his pants, bent him over the table, and "massaged [his] buttocks, stating[, "L]oosen them cheeks

up. [Y]ou['re] too tense. It'll be a lot easier." (Id.) Muhammad felt the doctor's fingers "probing and digging as if searching for gold" for more than two minutes. (Id.) Dr. Smith stated, "Well again I find no prostate enlargement or hem[o]rrhodal flareup and no rectal bleeding." (Id.)

Dr. Smith then ordered that Muhammad be placed in a medical observation cell until he had a bowel movement, saying "We all believe you['re] manipulating your fecal matter putting blood in it." (Pl.'s Aff., at 1, ECF No. 7-3.) The doctor and other staff members checked Muhammad to ensure that he had not been "intentionally cutting [him]self biting the insides of mouth and so forth" to draw blood to place in his stool; they found no such self-inflicted injuries. (Pl.'s Aff., at 1, ECF No. 7-9.) Five hours later, Muhammad had a bowel movement.

### 2. Defendants' Exhaustion Defense

Dr. Smith asserts that he is entitled to summary judgment and the claims against him should be dismissed because Muhammad failed to exhaust administrative remedies properly before filing this civil action about the November 2015 rectal exams. After review of the record, the court agrees.

The Prison Litigation Reform Act ("PLRA"), among other things, provides in 42 U.S.C. § 1997e(a) that a prisoner cannot bring a civil action concerning prison conditions until he has first exhausted available administrative remedies. This exhaustion requirement is "mandatory." Ross v. Blake, __ U.S.__, 136 S. Ct. 1850, 1856 (2016). It "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." Porter v. Nussle, 534 U.S. 516, 532 (2002). To comply with § 1997e(a), an inmate must follow each step of the established grievance procedure that the facility provides to prisoners and meet all deadlines within that procedure before filing

his § 1983 action. See Woodford v. Ngo, 548 U.S. 81, 90-94 (2006) (finding inmate's untimely grievance was not "proper exhaustion" of available administrative remedies under § 1997e(a)).

The defendants bear the burden of proving the affirmative defense that Muhammad failed to exhaust available administrative remedies regarding his claims before filing suit. Jones v. Bock, 549 U.S. 199, 212 (2007). Once they have done so, Muhammad may yet escape summary judgment under § 1997e(a) if he states facts showing that the remedies under the established grievance procedure were not "available" to him. Ross, 136 S. Ct. at 1859 (noting that circumstances making prison grievance procedures unavailable "will not often arise"). Generally, "an administrative remedy is not considered to have been available if a prisoner, through no fault of his own, was prevented from availing himself of it." Moore v. Bennette, 517 F.3d 717, 725 (4th Cir. 2008).

Operating Procedure ("OP") 866.1 is the established administrative remedies procedure for inmates in VDOC facilities and, thus, it is the procedure they must follow to comply with § 1997e(a). (See Messer Decl. Ex. B, ECF No. 42-3.) Under OP 866.1, an inmate with a grievance about some event or issue must first make a good faith effort to resolve his concerns informally. He must normally document this informal resolution effort by completing an informal complaint form and submitting it to prison staff, who will log his submission on the computer and issue him a receipt. Prison staff will then provide the inmate with a written response on the bottom of the informal complaint form and return it to him within fifteen days. The inmate can then initiate the next step under OP 866.1—a regular grievance, with the informal complaint attached.

A regular grievance must be filed within 30 days of the occurrence about which it complains. Only one issue may be addressed per grievance. If a regular grievance is properly

and timely filed, the warden or his designee will investigate and send the inmate a Level I response. If the responding official determines the grievance to be unfounded, for full exhaustion, the inmate must appeal that holding to Level II, the regional administrator, and in some cases, to Level III.

In Claim 1, Muhammad contends that Dr. Smith "used excessive force against [him] by sexually assaulting him (sodomy) and being deliberately indifferent to [his] safety and serious medical needs, and violating [his] due process rights/common law, by his illegally body searching and seizing me" without consent. (Compl. ¶ 36.) Under the regular grievance procedures in OP 866.1, Muhammad had until December 4, 2016, to file a timely regular grievance alleging that Dr. Smith had violated his rights on November 3 by forcing him to undergo a rectal exam. He had until December 20 to file a regular grievance alleging Dr. Smith's violations of his rights on November 19. The defendants' evidence is that Muhammad did not file any regular grievances about the rectal examinations by these deadlines, and he offers no evidence in dispute. Because he did not follow the procedures or the timelines of OP 866.1, Muhammad did not properly exhaust administrative remedies about his complaints against Dr. Smith in Claim 1.

Muhammad's submissions do not present facts demonstrating that the regular grievance procedure was unavailable to him during November and December 2015. In fact, on November 16, 2015, Muhammad filed an informal complaint about Dr. Smith's other medical decisions regarding his complaints of blood in his stools. Muhammad then filed a regular grievance on these issues on November 30, #ROSP-15-REG-00492, which was deemed unfounded and unsuccessfully appealed. (See Messer Decl. Ex. A, at 5-8, ECF No. 42-2.) None of these filings refer to the rectal exams on November 3 and 19, 2015.

Muhammad contends that he properly exhausted his claims about the rectal exams under a Prison Rape Elimination Act ("PREA") exception to the normal regular grievance deadline. PREA is a federal statute enacted to establish a zero-tolerance policy for prison rape, to develop national standards for punishing those who rape prisoners, and to increase accountability for prison officials to report and prevent prison rape. 42 U.S.C. §§ 15602-15609. In response to the federal statute, the VDOC adopted OP 38.3 defining types of sexual abuse that inmates and staff may report using separate, protective procedures, including a PREA hotline. (See King Aff. Ex. A, ECF No. 42-5.) One of these protective procedures is that inmates have no deadline to submit a regular grievance about allegations of sexual abuse. OP 38.3(IV)(E)(1)(g); OP 866.1(VI)(A)(1)(c) ("There is no time limit on when an offender may submit a grievance regarding an allegation of sexual abuse.").

Inmates cannot dodge the regular grievance deadline and benefit from the PREA exception merely by using the words sexual abuse or assault to describe any unwanted contact with a staff member or contractor, however. Under the VDOC's PREA procedures, sexual abuse occurs when, without the inmate's consent, there is "[p]enetration of the anal or genital opening, however slight, by a hand, finger . . . that is unrelated to official duties or where the staff member [or] contractor . . . has the intent to abuse, arouse, or gratify sexual desire. . . ." OP 38.3(III). The definition of sexual abuse in the PREA procedure expressly excludes "incidental touching during security searches, medical personnel engaged in evidence gathering or legitimate medical treatment, or to health care personnel performing body cavity searches in order to maintain security and safety within a facility." Id.

The parties agree that Muhammad filed a PREA regular grievance on February 24, 2016, #ROSP-16-REG-0072, complaining that he was subjected to aggravated sexual battery, sexual

assault, forcible sodomy, carnal knowledge" by Dr. Smith on November 3 and 19, 2015. (See Compl. Ex., at 3, ECF No. 1-1.) The Level I response states: "Investigation: Per ROSP Institutional Investigator Fannin, this [grievance] was deemed Non-PREA. Investigator Fannin determined this to be a medical procedure. Per ROSP Medical department, you consented to two different examinations. There is no evidence to support your allegations." Id. at 2. The Level II response upheld the ruling that #ROSP-16-REG-00072 involved a Non-PREA issue and was unfounded.

Muhammad asserts that this PREA regular grievance and his appeals therefrom fully satisfy the exhaustion requirement in § 1997e(a) for his claims against Dr. Smith. The court cannot agree. The February 24, 2016 regular grievance was not filed within the 30-day window for regular grievances about the incidents of which he complains. Moreover, taking Muhammad's allegations in the light most favorable to him, he does not present evidence that Dr. Smith conducted the two rectal exams with any "intent to abuse, arouse, or gratify sexual desire" as required for his actions to meet the PREA procedure's definition of sexual abuse. OP 38.3(III). Muhammad alleges that the doctor had no legitimate reason to conduct the rectal exams because a recent PSA test was normal and Muhammad did not consent to the rectal exams. He also alleges that the doctor knew the exams would cause Muhammad to suffer an adverse emotional response because he had been sexually abused in the past. Even taken as true, these allegations cannot support a reasonable inference that the rectal exams were not legitimate medical procedures or that Dr. Smith performed them with any intentions of becoming sexually aroused or gratifying sexual desires.

On the contrary, Dr. Smith's conduct on November 3 and 19, 2015, as alleged in Muhammad's submissions, clearly falls outside the definition of sexual abuse conduct to which

the PREA deadline exception applies. Dr. Smith performed the rectal exams on these dates in the course of his "official duties" as Muhammad's attending physician, with the stated intention to rule out an enlarged prostate, rectal bleeding, and/or self-injury and feces manipulation as potential explanations for the blood Muhammad was reportedly observing in his stools. Thus, Muhammad fails to present any material fact in dispute showing that Dr. Smith's actions constituted sexual abuse in any sense of that term under PREA exception.

Based on the foregoing, the court concludes that Dr. Smith is entitled to summary judgment because Muhammad did not properly exhaust available administrative remedies as to the only claims against this defendant. Muhammad did not file a regular grievance within the 30-day deadline under OP 866.1 as to any of his claims concerning the November rectal exams, and his allegations in the February 24, 2016 PREA grievance did not qualify for the PREA exception to that deadline.[2] Thus, his claims that these exams constituted sexual assault, excessive force, an illegal search in violation of the Fourth Amendment, or a deprivation of his right to refuse treatment in violation of the Due Process Clause were not properly raised to prison officials within the deadlines of the established and available administrative remedies procedure and will be dismissed with prejudice under § 1997e(a).

---

[2] Muhammad also alleges that on January 20, 2016, he began sending "PREA regular grievances" to Barksdale and Messer, the grievance coordinator, who did not process them. (Compl. ¶ 45.) These other PREA grievances are not in the record. In any event, Muhammad cannot rely on them in opposing Dr. Smith's argument that he failed to properly exhaust administrative remedies, since they were filed outside the 30-day deadline for non-PREA regular grievances under OP 866.1.

3.  Dismissal of Other Defendants to Claim 1

The other defendants have moved for dismissal of Claim 1 for failure to state any actionable § 1983 claim.  The court concludes that this motion must be granted.[3]

Muhammad first contends that Deel, Belcher, Brown, Martin, and Freeman failed to intervene to protect Muhammad by preventing Dr. Smith from forcing him to undergo unnecessary rectal exams without his consent and thus conspired to allow these violations of his rights.  Deliberate indifference to an inmate's serious medical needs is a violation of the Eighth Amendment's prohibition against cruel and unusual punishment.  See Estelle v. Gamble, 429 U.S. 97, 104-05 (1976).  To prove the element of deliberate indifference, the plaintiff must state facts showing that a particular defendant actually knew of and disregarded an excessive risk of serious harm to plaintiff's health presented by a proposed course of conduct.  Farmer v. Brennan, 511 U.S. 825, 837 (1994).  Nurses or officials with no medical training may lawfully defer to the attending physician's professional expertise on questions about the necessity or proper performance of a medical procedure.  See Shakka v. Smith, 71 F.3d 162, 166 (4th Cir. 1995). Thus, the court cannot find any Eighth Amendment claim arising from Muhammad's allegations that these defendants failed to stop Dr. Smith from performing the rectal exams as he did on November 3 and 19, 2015.

Muhammad's allegations of conspiracy must also be dismissed.  Stating a conspiracy claim requires allegations of facts that, if proven, reasonably lead to the inference that purported conspirators shared the same objective to try to "accomplish a common and unlawful plan" to

---

[3]  The non-medical defendants' motion contends that the court previously "dismissed" Claims 1 and 4 as to all defendants except Dr. Smith and Dr. Owens.  (Defts.'s Mem. Supp. 11, ECF No. 32.)  This argument lacks merit. The order at issue, entered November 4, 2016, denied Muhammad's attempts to amend the complaint; it did not dismiss any claims from the initial complaint, however, or direct the clerk to terminate any defendants as parties. (See Order 1-4, ECF No. 18.)  Moreover, in summarizing the claims from that complaint, the court made no attempt to identify all defendants implicated in each claim and, in fact, then directed the clerk to serve the initial complaint on all defendants therein named.  (Id. at 4.)  Nevertheless, for reasons to be explained, the court finds that the motion to dismiss must be granted.

11

violate the plaintiff's federal rights. Hinkle v. City of Clarksburg, 81 F.3d 416, 421 (4th Cir. 1996). "[R]ank speculation and conjecture" or conclusory labeling of the defendants' actions as a "conspiracy" as Muhammad has done here cannot state an actionable claim, especially when the actions are capable of innocent interpretation. Id. at 422; Nemet Chevrolet, 591 F.3d at 255.

Muhammad next alleges that defendants Elam, Hamilton, Barksdale, Fannin, Bentley, and Phipps, during the grievance proceedings, violated his rights by failing to investigate or correct Dr. Smith's misconduct. These omissions, however, do not implicate any constitutionally protected right. See, e.g., Linda R.S. v. Richard D., 410 U.S. 614, 619 (1973) (holding that individuals have no protected interest in the investigation or prosecution of others). Muhammad's allegations that these defendants failed to follow VDOC's grievance procedures or PREA investigation protocols also do not implicate any constitutionally protected right and, thus, are not actionable under § 1983. Riccio v. Cty. of Fairfax, 907 F.2d 1459, 1469 (4th Cir. 1990) ("If state law grants more procedural rights than the Constitution would otherwise require, a state's failure to abide by that law is not a federal due process issue.").

Finally, Muhammad alleges that Elam, Hamilton, Barksdale, Fannin, Bentley, Deel, and Phipps "threaten[ed him] with physical violence, false retaliatory disciplinary incident reports and refusal to transfer me to security level 6" for his use of the grievance procedures and have thus caused unspecified "injury to his First Amendment rights." (Compl. ¶ 35.) The complaint does not present facts in support of these claims, and conclusory allegations of retaliation cannot survive a motion to dismiss. Adams v. Rice, 40 F.3d 72, 74 (4th Cir. 1994). Moreover, allegations of verbal harassment and threats by prison officials do not state any constitutional claim. Henslee v. Lewis, 153 Fed. App'x 178, 180 (4th Cir. 2005) (citing Collins v. Cundy, 603 F.2d 825, 827 (10th Cir. 1979)). For the several stated reasons, the court will grant the

defendants' motion to dismiss (ECF No. 31) as to Claim 1 and deny Muhammad's motion for summary judgment as to this claim.

### C. Claim 2: Retaliatory Suicide Watch

1. Muhammad's Allegations

On February 10, 2016, Muhammad delivered to Moore and Mullins a PREA emergency grievance (#001415), alleging that Dr. Smith had sexually assaulted him by performing rectal exams on November 3 and 19, 2015. Moore took the item to Sergeant Clinton Deel, who warned Muhammad that his allegations against Dr. Smith were making people angry.

Also on February 10, qualified mental health professional ("QMHP") Trent came to Muhammad's door. Muhammad reminded Trent that he had promised to interview Muhammad about a January 20 PREA regular grievance complaining that the November 2015 rectal exams by Dr. Smith were sexual assaults. Trent told Muhammad, "[I] also to[ld] you . . . that I also fear retaliation for you if you keep on continuing to pursue this sexual assault/sodomy" against Dr. Smith. (Comp. ¶ 45.)

Trent then said to Muhammad, "[O]n 2/8/16 you sent me a request form stating 'I am experiencing suicidal-homicidal tendencies.' So I am here to put you on 15-minute watch suicide precautions." (Id.) Muhammad explained to Trent that the request form was only a list of his mental health diagnoses and said, "[A]t no time do I plan on killing myself [and] I am not planning on ending up like the 4/19/14 (suicide)." (Id.) Trent said, "I told you I was afraid of retaliation for you. You just said you['re] going to kill yourself." (Id.) He reported that Barksdale had told him to put Muhammad on suicide precautions and said, "You are at risk to your safety health and well-being. You['re] filing too many requests, grievances, and now we all

feel like if you don't get your sexual assault grievances filed you['re] going to kill yourself." (Id.) Trent said that the order had already been written to place Muhammad on a 72-hour hold.

About 1:05 p.m. on February 10, Gilbert, Moore, and Mullins came and placed Muhammad in a strip cell on suicide precautions. They left him naked in the cell with only a safety smock and mattress. When Trent came by, Muhammad asked him for a safety blanket, his legal materials, and a roll of toilet paper in the cell. Trent said, "I kept trying to warn you." (Id.) That evening and the next morning, Muhammad received his regular Common Fair diet trays, rather than safety utensils approved for suicide precautions. When his laxative caused him to have loose bowel movements, he had no soap to wash his hands before eating. He told officers he was too cold to sleep, but did not receive a blanket, his legal materials, or a toilet paper roll.

Trent came to the cell at 9:50 a.m. on February 11 and told Muhammad, "We all made a huge mistake in error and off emotions. [My bosses Barksdale and Huff and I] went back and reread your request form. I've already written orders right here to release you from 15 minute watch." (Id.) Muhammad told Trent that he had not slept in the cold cell with no blanket and was "physically sick with the flu, head and sinus cold, body aches, cramps, pains, sore throat, migraine headaches, a couple bloody noses, [and] delirious[ ]" from lack of sleep. (Id.) Officers released Muhammad from strip cell conditions about 4:30 p.m.

Muhammad alleges that Trent, Huff, Barksdale, Gilbert, Moore, and Mullins placed him on suicide precautions, or ordered or failed to prevent that placement, to retaliate against him for exercising his First Amendment right to petition the government for redress of grievances. He also claims that during the suicide watch period, he was subjected to unconstitutional living conditions, in violation of the Eighth Amendment. These defendants have moved for summary judgment.

## 2. The Defendants' Evidence

The defendants contend that Muhammad was placed on suicide precautions because of his written statements and behavior and was released when he was calmer. Trent states:

> Records reflect that offender Muhammad submitted an Offender Request form to mental health stating that he had been hearing voices the early morning of February 8, 2016. [He] stated . . . that he felt his mental health was rapidly deteriorating and that he felt suicidal and homicidal tendencies. . . .
>
> Because of these statements and because Offender Muhammad became more erratic by my questioning, I determined that he needed to be placed on 24-hour suicide precautions for his own safety and for staff's safety. . . .
>
> Records reflect that the following day, February 11, 2016, . . . Muhammad stated that he did not and has never had any suicidal tendencies. . . . [His] thoughts were organized and complete. His demeanor was calm throughout our interaction. There was no acute mental health distress and no safety issues observed. Because of this, I authorized [him] to be released from suicide precautions.

(Trent Aff. ¶¶ 4-6.) Trent denies telling Muhammad that he feared he would be retaliated against or that Barksdale ordered Muhammad's placement on suicide precautions.

## 3. Retaliation Claim

Prison officials may not take actions that violate an inmate's "First Amendment right to be free from retaliation for filing a grievance" under the prison's established grievance procedure. Booker v. S.C. Dep't of Corr., 855 F.3d 533, 541 (4th Cir. 2017). On the other hand, claims of retaliation against prison inmates must be treated with healthy skepticism, because many actions by prison officials are "by definition 'retaliatory' in the sense that [they are in] respon[se] to prisoner misconduct" or other concerning behaviors. Cochran v. Morris, 73 F.3d 1310, 1317 (4th Cir. 1996); Adams v. Rice, 40 F.3d 72, 74 (4th Cir. 1994). "To state a valid claim for retaliation under section 1983, a prisoner must allege (1) a specific constitutional right, (2) the defendant's intent to retaliate against the prisoner for his or her exercise of that right, (3) a retaliatory adverse act, and (4) causation." Snodgrass v. Messer, No. 7:16CV00050, 2017 WL

975992, at *4 (W.D. Va. Mar. 10, 2017), aff'd, No. 17-6360, 2017 WL 3263650 (4th Cir. Aug.

1, 2017) (internal quotation marks and citation omitted).

> A plaintiff's assertion that the retaliatory act was taken in response to the exercise of a constitutionally protected right, when supported by specific facts, is sufficient to state a retaliation claim. Adams v. Rice, 40 F.3d 72, 75 (4th Cir. 1994). The facts alleged must warrant concern that the claimed retaliation was intended to have a chilling effect on the exercise of the plaintiff's right to access the courts. Am. Civ. Liberties Union v. Wicomico Cty., 999 F.2d 780, 785–86 & n. 6 (4th Cir. 1993). The prisoner need not succumb entirely or even partially to the threat; it is sufficient that the retaliation was intended to limit the prisoner's right of access to the courts and was reasonably calculated to have that effect. Hudspeth [v. Figgins], 584 F.2d [1345,] 1348 (4th Cir. 1978).

Thompson v. Clarke, 633 F. App'x 207, 208 (4th Cir. 2016) (unpublished).

Taking the evidence in the light most favorable to Muhammad, the court concludes that his retaliation claim against Trent, Huff, and Barksdale survives summary judgment. Specifically, Muhammad has presented facts supporting a reasonable inference that Trent, Huff, and Barksdale placed him on suicide precautions to discourage him from suing Dr. Smith over the rectal exams. The court finds material disputes of fact regarding these defendants' interpretation of Muhammad's February 8 request form, the content of his February 10 conversation with Trent, the reasons they ordered suicide precautions, and the reasons they ordered Muhammad's release from those precautions when they did. Based on these disputes, the court will deny summary judgment for these three defendants

The court finds no material disputed fact showing that Gilbert, Moore, or Mullins placed Muhammad on precautions to retaliate against him. Muhammad alleges that the order for precautions came from Trent, by order of Huff and Barksdale. He presents no evidence that the other defendants to this claim had any authority to order the precautions or to alter the cell conditions for an inmate subject to those precautions. In addition, Gilbert, Moore, and Mullins could lawfully defer to Trent's professional expertise as the attending QMHP on questions about

the necessity for the 15-minute watch order and the cell conditions it authorized. See Shakka, 71 F.3d at 166. Accordingly, the court will grant summary judgment for these three defendants, and will deny Muhammad's summary judgment on the retaliation contention in Claim 1 as to all defendants.

### 4. Living Conditions Claim

The court also finds no genuine material fact in dispute on which Muhammad could prove his claim that the defendants subjected him to unconstitutional conditions during the safety precautions on February 10 and 11, 2016. The Eighth Amendment, which applies to the states under the Due Process Clause of the Fourteenth Amendment, "protects inmates from inhumane treatment and conditions while imprisoned." Williams v. Benjamin, 77 F.3d 756, 761 (4th Cir. 1996). "[T]he Constitution does not mandate comfortable prisons," however, and conditions that are "restrictive and even harsh . . . are part of the penalty that criminal offenders pay for their offenses against society." Rhodes v. Chapman, 452 U.S. 337, 347-49 (1981). It is well established that "only the unnecessary and wanton infliction of pain implicates the Eighth Amendment." See Wilson v. Seiter, 501 U.S. 294, 297 (1991) (internal quotation marks and citations omitted).

To state such a claim, Muhammad must show that: (1) objectively, the defendants detained him under conditions that deprived him of "the minimal civilized measure of life's necessities" and "pos[ed] a substantial risk of serious harm"; and (2) subjectively, each of them acted with "deliberate indifference to [his] health or safety." Farmer, 511 U.S. at 834. At a minimum, Muhammad must show "significant physical or emotional harm" resulted from the challenged conditions. Shakka, 71 F.3d at 166. He must also show that each defendant was

deliberately indifferent—that each one knew of and disregarded an excessive risk to his health or safety. See Farmer, 511 U.S. at 837.

Muhammad presents no disputed material fact supporting either facet of this standard. First, he does not state facts showing deprivation of life's basic necessities. The evidence establishes that he was inside a cell, clothed in a safety smock, and received regularly scheduled meals and a mattress for sleeping. In response to the defendants' motion, Muhammad states that he was uncomfortably cold without a blanket, had to eat with dirty hands, suffered a headache and other temporary discomforts, and developed "a sinus and headcold for a little over a month" after the incident." (Pl.'s Mot. Summ. J. 4, ECF No. 34.) He does not cite evidence, however showing that his sickness required medical treatment or that it was caused by the challenged conditions.

Second, Muhammad has not cited facts showing any defendant's knowledge that the conditions posed an excessive risk that he would suffer any serious harms while under mental health watch. Indeed, these conditions are designed for the inmate's safety. Even if any of the defendants failed to follow some VDOC policies during the precautions period, such violations do not state constitutional claims actionable under § 1983. Riccio, 907 F.2d at 1469. For the stated reasons, the court concludes that all of the defendants to Claim 2 are entitled to summary judgment as a matter of law on the contention of unconstitutional conditions.[4]

---

[4] As in Claim 1, Muhammad's conclusory labeling of the defendants' actions in Claim 2 as a "conspiracy" are insufficient to support a § 1983 claim on that theory. Hinkle, 81 F.3d at 421.

### D. Claim 3: Classification Procedures

#### 1. Background

Red Onion has implemented a segregation step down program, set out in local OP 830.A. It is an "incentive-based housing program [that] creates a pathway for offenders to step-down from Security Level "S" (Segregation) to lower security levels in a manner that maintains public, staff and offender safety." (Gilbert Aff. ¶ 4, ECF No. 32-1; id. Encl. A.) As an inmate meets preset, prosocial goals at each level of the program, including the seven Challenge Series workbooks, he is eligible to advance in levels through Level S and to earn additional privileges.

Officers in the housing units track each inmate's progress toward the goals of his assigned step. They rate his behavior every week as poor, acceptable, or good in each of several categories, such as personal hygiene, standing for count, and respect. Counselors rate the inmate's program participation every week as incomplete, complete, or positive effort. In addition, Level S inmates are to have their security level and step status reviewed by the Institutional Classification Authority ("ICA") at least every ninety days and by an external review team every year.

When an inmate completes the Challenge Series curriculum and evaluators deem that he has achieved its behavioral goals in Level S, he will be stepped down to Security Level 6 ("SL6"). At this point, officials assess each inmate and assign him to one of three SL6 program pods geared to safely reintroduce him, in phases, into a social environment to interact with other inmates and test his readiness for possible transfer to Security Level 5 and, eventually, to other non-segregation settings. These three SL6 pods are the Secure Integrated Pod ("SIP") for inmates who break rules to remain in segregated housing; the Secure Allied Management ("SAM") Pod for inmates vulnerable to victimization by other inmates because of cognitive

impairment or other factors; and the Step-Down pod, for inmates not appropriate for SIP or SAM.

### 2. Muhammad's Allegations

Muhammad's Claim 3 focuses on his 90-day ICA review hearing with Lieutenant Gilbert and Counselor Gibson on February 8, 2016. When they asked if Muhammad had a statement, he told them that he anticipated completing the Challenge Series by mid-February and wanted to transfer to the SAM pod because of his mental health code and his sedative medication prescribed for insomnia. The ICA recommendation was, however, that Muhammad should remain in Level S "for a longer period of stable adjustment." (Compl. ¶ 56, ECF No. 1.)

Muhammad filed an informal complaint and then a regular grievance about the ICA's ruling. Unit Manager Duncan spoke with him about the grievance on March 9, 2016, and asked if he wanted to withdraw it. She said, "[I]t won't do any good to keep pursuing it 'cause . . . when we're ready to release you to Security Level 6 SAM pod [or the Step-Down pod] we will not until though." (Id.) Muhammad refused to withdraw the grievance and appealed, but Defendants Younce and Elam upheld the decision to keep him in Level S for the time being.

Muhammad contends that these actions by Gilbert, Gibson, Duncan, Younce, and Elam violated his Fourteenth Amendment right "to procedural due process and avoiding conditions of confinement, a typical and significant hardship." (Id. at ¶ 57.) Liberally construed, he is claiming that these defendants failed to consider his statement or grievance in recommending not to transfer him to the SAM pod or approving that recommendation.[5]

---

[5] Muhammad also mentions "retaliation" in his discussions of this claim, as the court recognized in an earlier order. (Order 1, ECF No. 18.) In the complaint itself, however, Muhammad does not assert retaliation as a legal theory for Claim 3. (See Compl. ¶ 57, ECF No. 1.) Moreover, he does not state disputed facts showing that the defendants decided on February 8 to keep Muhammad at Level S because of a lawsuit or grievance. Thus, he fails to state a retaliation claim related to that classification decision or his appeals of that decision. See Adams, 40 F.3d at 74 (conclusory allegations of retaliation do not state actionable § 1983 claim).

### 3. Defendant's Evidence

In support of the defendants' motion, Gilbert states that since "the Challenge Series is a cognitive based program, offenders who incur charges and continue to have behavior problems, are considered to have not learned new thought patterns and social skills as taught by the program" and may be required to start over with the first workbook. (Gilbert Aff. ¶ 6, ECF No. 32-1.) Gilbert states that bypassing any of the workbooks is not allowed, and some inmates must repeat the series several times before evaluators find they have mastered the behavior changes and skills required to move to a Level 6 status. Court records reflect that prison officials previously required Muhammad to repeat the Challenge Series beginning in May 2014, and he sued them unsuccessfully over alleged due process violations. See Muhammad v. Mathena, No. 7:14CV00529, 2017 WL 395225, at *1-2 (W.D. Va. Jan. 27, 2017).

At Muhammad's annual ICA review of his good time earning rate on February 1, 2016, Gilbert recommended that he should remain at the lowest rate, Level 4. In so doing, Gilbert relied on records showing that during the previous year, Muhammad had received two disciplinary charges for threatening bodily harm and tampering with security devices, had "scored 40 points on his earning class assessment, had received poor status reviews, and did not achieve his annual goals." (Gilbert Aff. ¶ 12.) For these same reasons, at Muhammad's security status review on February 8, Gilbert recommended that he was not yet ready for Level 6 and needed a "longer period of stable adjustment."[6] (Id. at ¶ 13.) Muhammad does not dispute this evidence.

---

[6] Gilbert states that Muhammad completed Book 7 of the Challenge Series in early March 2016, and his counselor recommended his reduction from Level S in May 2016 to begin the first phase of the Step-Down pod. Before his release, however, Muhammad received new disciplinary charges for threatening bodily harm to any person and threatening to spit or transfer bodily waste on any person. Based on these charges, officials recommended that he stay longer in Level S. In a later pleading, Muhammad asserts that these disciplinary charges were retaliatory (Pl.'s Mot. Summ. J. 6, ECF No. 34), but has not moved to amend the complaint to add this separate retaliation claim.

### 4. No Protected Liberty Interest

Procedural due process claims in the prison context have two components. First, the court must determine whether the inmate has a protectable liberty interest in avoiding the more stringent conditions of continued confinement in segregation. Incumaa v. Stirling, 791 F.3d 517, 526 (4th Cir. 2016). If the inmate has no protectable liberty interest, then he has no federal right to any particular procedural protections, or in other words, no process is due. See Wilkinson v. Austin, 545 U.S. 209, 221 (2005) ("We need reach the question of what process is due only if the inmates establish a constitutionally protected liberty interest . . . ."). A state regulation may create a potential liberty interest in avoiding a particular set of conditions, but that interest is constitutionally protected only if the conditions present "atypical and significant hardship compared to the expected conditions of [the inmate's] prison sentence." Sandin v. Conner, 515 U.S. 472, 483-84 (1995). If a protectable liberty interest exists, then the court must evaluate whether the inmate received adequate process to protect that interest. Incumaa, 791 F.3d at 526.

In other cases filed by Level S inmates in the step down program, this court has concluded that inmates do not have a constitutionally protected liberty interest in being released from Level S, because living conditions for such inmates do not qualify as "atypical and significant hardship" under Sandin. See, e.g., Obataiye-Allah v. Virginia Dep't of Corr., No. 7:15CV00230, 2016 WL 5415906, at *10 (W.D. Va. Sept. 28, 2016) (Jones, J.), aff'd sub nom. Obataiye-Allah v. Clarke, No. 16-7413, 2017 WL 1828018 (4th Cir. May 4, 2017). Accordingly, Level S inmates have "no actionable claim under § 1983 that any particular procedural protection is constitutionally required during the OP 830.A classification proceedings." Id. The court reached the same conclusions on Muhammad's due process claim in No. 7:14CV00529.

Based on the sound reasoning of the Obataiye-Allah decision and related cases,[7] likewise, the court concludes in the present case that Muhammad has no protected liberty interest in being released from Level S, because conditions there are not atypical compared to conditions faced by inmates in the general prison population. Without a protected liberty interest, he has no federal right to particular procedures or outcomes at the periodic reviews of his classification status under OP 830.A. Thus, even if Muhammad could prove that the defendants failed to consider Muhammad's statement and grievance in reaching or approving the February 8 decision to recommend his retention at Level S, these omissions do not implicate any constitutionally protected right and are not actionable under § 1983. Moreover, even if the defendants violated OP 830.A or other VDOC policies in what they considered in making their decision, such violations of state laws and regulations do not give rise to any federal claim actionable under § 1983. Riccio, 907 F.2d at 1469. Thus, the defendants are entitled to summary judgment as a matter of law on Claim 3, and Muhammad's motion for summary judgment must be denied as to this claim.

## E. Claim 4: Tinted Eye Glasses

### 1. Muhammad's Allegations

After Muhammad was attacked by another inmate in January 2013 and he suffered a head injury, he began experiencing double vision, blurred vision, and even brief periods of blindness in one or both eyes. In 2014, an eye specialist diagnosed him with "hyper-sensory sensitivity to all bright lighting and natural lighting." (Compl. ¶ 65.) Since the head injury, Muhammad has

---

[7] See generally Delk v. Younce, No. 7:14CV00643, 2017 WL 1011512, at *9 (W.D. Va. Mar. 14, 2017); DePaola v. Va. Dep't of Corr., No. 7:14cv692 (W.D. Va. Sept. 28, 2016); Canada v. Clarke, No. 7:15cv65 (W.D. Va. Sept. 27, 2016); Velazquez v. Va. Dep't of Corr., No. 7:15cv157 (W.D. Va. Sept. 27, 2016); Batte v. Clarke, No. 7:15cv158 (W.D. Va. Sept. 27, 2016); Vigil v. Clarke, No. 7:15cv159 (W.D. Va. Sept. 27, 2016); Mukuria v. Clarke, No. 7:15cv172 (W.D. Va. Sept. 27, 2016); Barnard v. Clarke, No. 7:15cv160 (W.D. Va. Sept. 26, 2016); Faison v. Clarke, No. 7:15cv530 (W.D. Va. Sept. 26, 2016).

also experienced frequent migraine headaches that he believes are aggravated by the bright lighting in his cell at Red Onion for most of the day. In 2015, a specialist diagnosed him with post-concussion syndrome and recommended "neurontin and magnesium oxide" for the headache pain. (Id.) Because of Muhammad's history of kidney problems, however, he cannot safely take these and many other pain medications for his migraines.

On February 22, 2016, Muhammad had an appointment with Dr. Owens, an optometrist. After explaining this medical history, he told Dr. Owens that his current eye glasses prescription was for 20 percent tinted lenses that did not block out enough light to lessen his headache pain. He asked Dr. Owens to prescribe "the maximum amount of grey tint allowed" (id.), 23 to 29 percent (Pl. Mot. Summ. J. 8, ECF No. 34). Muhammad claims that another Red Onion inmate had been provided with 23 percent tinted lenses.

Dr. Owens said, "I see no problem rewrit[ing] the orders for the maximum amount of grey tint for you." (Id.) Then, he checked Muhammad's eyes and ordered "1/2 prism horizontal and vertical lines to help with" the double vision. (Id.) When Muhammad received his glasses in March 2016, they were only 20 percent tinted. He filed an informal complaint, and the doctor's secretary, Patti Harless, responded: "Dr. Owens prescribed you the amount of tint that he felt you needed." (Id.) Muhammad's regular grievance about this issue was deemed unfounded, and his appeal was unsuccessful.

In Claim 4, Muhammad sues Dr. Owens for deliberate indifference to his serious medical needs. He also sues Harless and Fred Schillings, VDOC Health Services Director. These defendants have filed motions to dismiss.

2. No Eighth Amendment Violation

"Deliberate indifference to an inmate's serious medical needs constitutes cruel and unusual punishment under the Eighth Amendment." Jackson v. Lightsey, 775 F.3d 170, 178 (4th Cir. 2014) (citing Estelle v. Gamble, 429 U.S. 97, 104 (1976)). First, the inmate must show that the medical condition at issue was objectively serious—that is, "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Iko v. Shreve, 535 F.3d 225, 241 (4th Cir. 2008) (internal quotation marks omitted). Second, to prove deliberate indifference, the inmate must show that the defendant had "actual . . . knowledge of both the inmate's serious medical condition and the excessive risk posed by the official's [own] action or inaction" and responded unreasonably to that risk. Jackson, 775 F.3d at 178 (citing Farmer, 511 U.S. at 837). This component requires proof of intent beyond mere negligence, errors in judgment, inadvertent oversights, or disagreements about the prisoner's treatment plan. Id. Muhammad's claim against Dr. Owens fails on both facets of this standard.

Muhammad does not show a serious medical need for a different lens prescription than he received from Dr. Owens. The record is devoid of evidence that any doctor has found the slight increase in tint that Muhammad requested to be medically necessary for his vision or headache problems. Muhammad offers in support of his claim: (a) his layman's opinion that lenses darker than 20 percent might alleviate his headache pain and (b) the doctor's comment before the eye examination that he saw "no problem" at that time with ordering a darker tint. (Compl. ¶ 65.) These facts show, at the most, Muhammad's desire for a darker tint. See Bowring v. Godwin, 551 F.2d 44, 48 (4th Cir. 1977) (holding that "the essential test is one of medical necessity and not simply that which may be considered merely desirable").

More importantly, Muhammad's submissions do not show that Dr. Owen was deliberately indifferent to his medical needs. The doctor did not ignore his complaints and, after examining his eyes, prescribed tinted lenses that were also adjusted to alleviate his double vision problem. Muhammad's dissatisfaction with the tint of his lenses is nothing more than a disagreement with the doctor's professional judgment, and such disagreements are not actionable under § 1983. Accordingly, the court concludes that Dr. Owen's motion to dismiss must be granted.

The court will also grant the other defendants' motion to dismiss as to Claim 4. Harless could rightfully rely on Dr. Owens' judgment regarding the appropriate course of treatment for Muhammad's vision-related issues. See Shakka, 71 F.3d at 167. Schillings, in his supervisory role as a VDOC administrator, could be held liable under § 1983 if evidence showed that he committed some action or omission that caused a subordinate's violation of Muhammad's constitutional rights. See Shaw v. Stroud, 13 F.3d 791, 798-800 (4th Cir. 1994). Muhammad's submissions do not make any such showing. Therefore, the court will deny his motion for summary judgment as to Claim 4.

## III.

For the reasons stated, the court will deny Muhammad's motion for summary judgment as to all claims. The court will grant Dr. Smith's motion for summary judgment, based on Muhammad's failure to exhaust his administrative remedies properly regarding his only claim against Dr. Smith. The court will grant the non-medical defendants' motion for summary judgment as to Claims 2 and 3 as to all defendants except as to the contention in Claim 2 that Trent, Huff, and Barksdale imposed suicide precautions on Muhammad to retaliate against him

for exercising his First Amendment right to petition for redress.  Finally, the court will grant the defendants' motions to dismiss as to Claims 1 and 4.  An appropriate order will issue this day.

The Clerk is directed to send copies of this memorandum opinion and accompanying order to plaintiff and to counsel of record for the defendants.

ENTER:  This _8th_ day of August, 2017.

_____
United States District Judge